## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, *et al.*, | : | Bankr. No. 18-10601-MFW |
| | : | (Jointly Administered) |
| Debtors. | : | |
| —————————————————————— | : | |
| | : | |
| BRADLEY COOPER, 22nd AND INDIANA, INC., | : | Civ. No. 19-242-MN |
| BRUCE COHEN, BRUCE COHEN PRODUCTIONS, | : | |
| ROBERT DE NIRO, CANAL PRODUCTIONS, INC., | : | |
| DAVID O. RUSSELL, KANZEON CORP., JON | : | |
| GORDON, and JOHN GORDON PRODUCTIONS, INC., | : | |
| | : | |
| Appellants, | : | |
| v. | : | |
| | : | |
| LANTERN ENTERTAINMENT LLC, | : | |
| | : | |
| Appellee. | : | |
| —————————————————————— | : | |
| | : | |
| BRUCE COHEN PRODUCTIONS and BRUCE COHEN, | : | Civ. No. 19-243-MN |
| | : | |
| Appellants, | : | |
| v. | : | |
| | : | |
| LANTERN ENTERTAINMENT LLC, | : | |
| | : | |
| Appellee. | : | |

## MEMORANDUM

Christopher P. Simon, Kevin S. Mann, CROSS & SIMON, LLC, Wilmington, DE; Michael I. Gottfried, Roye Zur, LANDAU GOTTFRIED & BERGER LLP, Los Angeles, CA – Attorneys for Appellants Bradley Cooper, 22nd and Indiana, Inc., Bruce Cohen, Bruce Cohen Productions, Robert De Niro, Canal Productions, Inc., David O. Russell, Kanzeon Corp., Jon Gordon, and Jon Gordon Productions, Inc.

R. Craig Martin, Maris J. Kandestin, DLA PIPER LLP (US), Wilmington, DE; Thomas R. Califano, Rachel Ehrlich Albanese, DLA PIPER LLP (US), New York, NY – Attorneys for Appellee Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC)

Susan E. Kaufman, LAW OFFICE OF SUSAN E. KAUFMAN, LLC, Joseph Kohanski, David E. Ahdoot, BUSH GOTTLIEB, Glendale, CA – Attorneys for the Directors Guild of America, Inc., Screen Actors Guild – American Federation of Television and Radio Artists, and the Writers Guild of America West. Inc.

March 20, 2020

NOREIKA, U.S. DISTRICT JUDGE

Pending before the Court are two appeals[1] from the Bankruptcy Court's order dated January 23, 2019 (B.D.I. 2013)[2] ("Order"), entered in the Chapter 11 cases of The Weinstein Company Holdings, LLC ("TWC") and certain affiliates (together, "the Debtors"), which memorialized the Bankruptcy Court's January 14, 2019 bench ruling on various motions (Appx. 28, B.D.I. 2005, 1/14/19 Hr'g Tr. at 133:8-137:19) ("the Bench Ruling"). The appeals arise from the sale of substantially all of the Debtors' assets to appellee Spyglass Media Group, LLC ("Spyglass"), including entertainment industry contracts to which the Debtors were parties. The contracts at issue ("Talent Party Agreements") related to the production of a film released several years ago, pursuant to which the production company received the performance and the rights to exploit the produced material, and appellants ("Talent Parties") received fixed compensation and the right to contingent compensation related to revenues generated by the film.

In connection with the designation of contracts to be purchased in the asset sale, Spyglass filed an action against appellants Bruce Cohen and Bruce Cohen Productions ("the Cohen Parties," and together with the Talent Parties, "the Appellants") seeking a determination that Cohen's producing agreement ("Cohen Agreement") in connection with the film was not an executory contract. Spyglass anticipated that the resolution of the dispute over the Cohen Agreement would

---

[1]     Separate appeals were filed by Bradley Cooper, 22nd and Indiana, Inc., Bruce Cohen, Bruce Cohen Productions, Robert De Niro, Canal Productions, Inc., David O. Russell, Kanzeon Corp., Jon Gordon, and Jon Gordon Productions, Inc. (Civ. No. 19-242-MN) and Bruce Cohen and Bruce Cohen Productions (Civ. No. 19-243-MN). The parties stipulated to joint briefing of these appeals. (*See* Civ. No. 19-242-MN at D.I. 16). Unless otherwise indicated, "D.I. __" refers to the docket of Civ. No. 19-242-MN.

[2]     The docket of the Chapter 11 cases, captioned *In re the Weinstein Company Holdings*, Case No. 18-10601-MFW (Bankr. D. Del.) is cited herein as "B.D.I. __." The appendix (D.I. 19-24) filed in support of Appellants' opening brief (D.I. 18) is cited herein as "A__," and the appendix (D.I. 30-33) filed in support of the Appellees' brief (D.I. 29) is cited herein as "Appx. __."

aid in a determination of the executory nature of similar contracts without burdening the Bankruptcy Court with multiple litigation. Pursuant to the Order, the Bankruptcy Court granted summary judgment in Spyglass's favor, ruling that the Cohen Agreement was not executory as of the Petition Date (defined below) and that, although Spyglass would be obligated to pay contingency compensation related to revenues generated after its purchase of the agreement, Spyglass had no obligation to pay the contingency compensation for revenues generated by the film years before Spyglass succeeded to its rights.

Cohen has appealed the Order. Additionally, Appellants challenge the Bankruptcy Court's ruling that Spyglass was able to "conditionally" designate Appellants' agreements for assumption and assignment subject to a determination of whether they were executory contracts. Also pending before the Court is the Motion for Leave to File *Amicus Curiae* Brief (D.I. 25) ("Motion for Leave") filed by the Directors Guild of America, Inc., Screen Actors Guild – American Federation of Television and Radio Artists, and the Writers Guild of America West, Inc. (together, "Movants"), in support of Appellants' appeals. For the reasons set forth below, the Motion for Leave is granted[3] and the Order is affirmed.

---

[3] Courts will exercise their discretion to allow an *amicus curiae* brief to be filed if rule 29 of the Federal Rules of Appellate Procedure is satisfied by demonstrating, under the most lenient standard, that (1) the movant has an adequate interest in the appeal; (2) the information supplied is desirable; and (3) the information being provided is relevant. Courts will deny leave in instances where the arguments and facts in the brief are patently partisan, are untimely, and where the litigant is competently and adequately represented. The Third Circuit has advised that motions for leave to file such briefs should be granted "unless it is obvious that the proposed briefs do not meet [Federal Rule of Civil Procedure] 29's criteria as broadly interpreted." *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 133 (3d Cir. 2002) (Alito, J., granting leave to file amicus brief). Spyglass has opposed the Motion for Leave. (D.I. 26). Spyglass points out that Movants represent various talent parties, the majority of whom are Appellants in the appeal, but in a unionized capacity under collective bargaining agreements ("CBAs") where residuals, and not participation payments, are at issue. The Court finds that the Movants had an adequate interest in the issues raised in these appeals. Movants are "seeking to protect deferred or contingent compensation," and assert that a "meaningful subset" of the CBAs include provisions that resemble those found in the Cohen Agreement. The information presented in Movants'

## I. BACKGROUND

### A. The Chapter 11 Cases and the APA

Debtors filed voluntary petitions under Chapter 11 on March 19, 2018 ("the Petition Date"), to facilitate a sale of substantially all of their assets under section 363 of the Bankruptcy Code. The Debtors filed a bid procedures and sale motion on the Petition Date, with Spyglass serving as the stalking horse bidder. On March 20, 2018, the Debtors filed a motion ("the Sale Motion") for approval of a sale of substantially all of the Debtors' assets to Spyglass, pursuant to terms negotiated prior to the Petition Date. (A1-254).

Attached to the Sale Motion was the *Asset Purchase Agreement by and Among The Weinstein Company Holdings LLC, the Persons Listed on Schedule 1 Hereto and Lantern Entertainment LLC*, dated as of March 19, 2018 (as subsequently amended, "the APA") providing that Spyglass will acquire certain "Purchased Assets" in connection with the sale. Spyglass's offer remained the highest and best offer received by the Debtors for their assets following the sale process.

Prior to the closing of the sale, the Debtors and Spyglass entered into two amendments to the APA. (*See* Appx. 5, B.D.I. 846; Appx. 8, B.D.I. 1187). The Debtors, Spyglass, and the Official Committee of Unsecured Creditors ("the Committee") extensively negotiated the second amendment ("the Second Amendment"). (Appx. 10, B.D.I. 1232). The Committee negotiated for and received in the Second Amendment, a deadline of November 8, 2018 for Spyglass to determine which executory contracts it would take by assignment ("the Assumption Outside Date"). (Appx. 8, B.D.I. 1187, ¶ 2(a); Appx. 9, B.D.I. 1202). Specifically, Section 2.8(i) of the APA provides:

> Assumption Outside Date. Notwithstanding anything in this Agreement or the Sale Order to the Contrary, the Contract Designation Outside Date shall be the last date on which the Buyer may (x) designate a Disputed Contract as an "Excluded Asset"

---

proposed brief was desirable and relevant. The Court therefore grants the Motion for Leave and has considered Movants' submissions in connection with this Memorandum.

pursuant to Section 2.8(c) (with any such Disputed Contract not so designated assumed by Buyer as an "Assumed Contract" in accordance with the terms thereof), (y) assume a Contract that was not identified as an Assumed Contract as of the Closing pursuant to Section 2.8(f) (with any such Contract not so assumed constituting an "Excluded Contract" following such date) or (z) designate a Previously Omitted Contract as an "Assumed Contract" pursuant to Section 2.8(g) (with any such Previously Omitted Contract not so designated constituting an "Excluded Contract" following such date). For the avoidance of doubt, nothing in this Section 2.8(i) shall in any way affect any other date set forth in this Section 2.8, including the dates set forth in Section 2.8(a).

In accordance with the APA, the Debtors filed seven notices listing contracts, which would potentially be assumed and assigned, and on the Assumption Outside Date, Spyglass filed its eighth and final notice of assumption of contracts (each, a "Contract Notice" and, collectively, "the Contract Notices.").[4] The Contract Notices filed prior to the closing contained the following disclaimer, in bold, or a substantially similar statement:

> **PLEASE TAKE FURTHER NOTICE that, the presence of an Assumed Contract and Lease listed on Exhibit 1 attached hereto does not constitute an admission that such Assumed Contract and Lease is an executory contract or unexpired lease or that such Assumed Contract and Lease will be assumed and assigned as part of the Sale. The Debtors reserve all of their rights, claims and causes of action with respect to the Assumed Contracts and Leases listed on Exhibit 1 attached hereto.**

(Appx. 6, B.D.I. 860, at 2).

On June 8, 2018, the Debtors filed the *Debtors' Statement Regarding Contracts to Be Transferred Pursuant to the Asset Purchase Agreement with Lantern Entertainment* ("the June 8th Contract Notice"). The June 8th Contract Notice stated that certain previously listed contracts were being removed because the Debtors had determined that such contacts were not executory and, therefore, were incapable of assumption and assignment under section 365 of the Bankruptcy Code. (Appx. 7, B.D.I. 1003, ¶¶ 5-6). The June 8th Contract Notice also contained the following

---

[4]     Appx. 2, B.D.I. 216 (Apr. 13, 2018), 282 (Apr. 20, 2018), 482 (Apr. 27, 2018), 860 (May 10, 2018), 1003 (June 8, 2018), 1457 (Sept. 5, 2018), 1512 (Sept. 20, 2018), 1665 (Nov. 5, 2018), 1695 (Nov. 8, 2018).

statement designed to put contract counterparties on notice that, notwithstanding the fact that their contracts were not executory, Spyglass could elect to purchase the Debtors' rights under such non-executory contracts under section 363 of the Bankruptcy Code: "Notwithstanding that the contracts set forth on Exhibit A are not executory contracts and are not being assumed and assigned pursuant to Section 365 of the Bankruptcy Code, the Asset Purchase Agreement provides for the purchase, by Lantern, of any rights or assets transferred to the Debtors pursuant to such contracts." (*Id.* ¶ 7). The Talent Party Agreements were listed on Exhibit A to the June 8th Contract Notice as non-executory contracts. (*Id.* Ex. A).

The Bankruptcy Court approved the sale of substantially all of the Debtors' assets ("the Sale") to Spyglass on May 9, 2018 (Appx. 5, B.D.I. No. 846) ("the Sale Order") for $287 million pursuant to the final amended APA (Appx. 9, B.D.I. 1202). On July 13, 2018, the Sale to Spyglass closed. (Appx. 11, B.D.I. 1247).

The Talent Party Agreements were listed as Disputed Contracts on the Contract Notice filed on November 8, 2018 ("the Final Contract Notice"). The Final Contract Notice included a reservation of rights regarding litigation involving the alleged executory nature of one of the Talent Party Agreements and noting that the outcome of that litigation would inform the parties' position in connection with all of the disputed Talent Party Agreements. (Appx. 18, B.D.I. 1695, at 2 n.3). The reservation of rights provided:

> The Purchaser filed a declaratory action against one talent counterparty, Bruce Cohen, on October 17, 2018, seeking a determination that the contract between Cohen and The Weinstein Company is not executory and therefore was already assigned to the Purchaser pursuant to Bankruptcy Code section 363 . . . . The Purchaser anticipates that the resolution of the Cohen Dispute will confirm the Purchaser's interest in the contract at issue in the Cohen Dispute, which involves a determination of the executory nature of the contracts similar to the Disputed Talent Party Contracts. The Purchaser believes that the resolution of the Cohen Dispute will inform the parties' position in connection with the Disputed Talent Party Contracts without burdening the Court with multiple litigations. The Purchaser reserves its right to assume the Disputed Talent Party Contracts in the event the Purchaser does not already own the rights to the Disputed Talent Party Contracts.

5

### B. The Talent Party Litigation and the Cohen Adversary Proceeding

On October 17, 2018, Spyglass initiated an adversary proceeding by filing a complaint against Bruce Cohen and Bruce Cohen Productions (together, "the Cohen Parties") seeking a declaratory judgment that the Cohen Agreement is not executory and was sold free and clear to Spyglass pursuant to the Sale. (Appx. 14, Adv. D.I. 1).[5] On October 18, 2018, Spyglass filed a motion for summary judgment ("the Summary Judgment Motion"), supported by a declaration from Irwin Reiter (Appx. 15, Adv. D.I. 8) ("the Initial Reiter Declaration"). Mr. Reiter held the position of executive vice president for accounting and financial reporting at TWC during the time period in question, and held the same position at Spyglass. (1/14/19 Hr'g Tr., at 53:11-12). The Cohen Agreement, in unredacted form, was attached as an exhibit to the Initial Reiter Declaration.

On November 1, 2018, the Cohen Parties filed an answering brief. (Appx. 16, Adv. D.I. 10) and on November 8, 2018, Spyglass filed its reply (Appx. 20, Adv. D.I. 11). Around the same time, most of the Talent Parties filed the *Supplemental Objection and Joint Motion of SLP Contract Counterparties to Clarify Sale Order* ("the Motion to Clarify"). (Appx. 17, B.D.I. 1664). The Motion to Clarify sought clarification that, among other things, the Sale Order did not authorize the sale of the rights appurtenant to the Cohen Agreement to Spyglass free and clear under section 363 of the Bankruptcy Code.

On November 16, 2018, the Talent Parties, including a number of individuals and entities not party to this appeal, filed the *Motion of Executory Contract Counterparties for Order Confirming that Counterparties' Agreements have been Designated by Lantern for Assumption and Assignment* ("the Motion to Confirm"). (Appx. 21, B.D.I. 1724). The Motion to Confirm sought confirmation that the agreements in question were conclusively designated for assumption

---

[5]     The adversary proceeding, captioned *Lantern Entertainment LLC v. Bruce Cohen Productions, et al.,* Adv, No. 18-50924 (MFW) (Bankr. D. Del.) ("the Cohen Adversary Proceeding") is cited herein as "Adv. D.I. __."

and assignment, despite the reservation of rights contained in the Final Contract Notice. On November 26, 2018, the Committee filed a joinder to the Motion to Confirm ("the Committee Joinder"). (Appx. 22, B.D.I. 1771).

On November 29, 2018, the Bankruptcy Court held a pre-trial conference. (Appx. 23, Adv. D.I. 20). The Bankruptcy Court agreed with Spyglass that the issues raised in the Summary Judgment Motion, the Motion to Clarify, the Motion to Confirm, and the Committee Joinder were so intertwined that it made sense to hear them together. (*Id.*).

On January 7, 2019, Spyglass filed an omnibus objection to address the issues raised in the Talent Parties' pleadings ("the Omnibus Objection"), all of which boil down to the question of whether the Talent Party Agreements are executory and, therefore, subject to cure by Spyglass, or if they are not executory, whether Spyglass purchased the contract rights under section 363 of the Bankruptcy Code. Spyglass and the Talent Parties attempted to mediate their dispute prior to Spyglass filing the Omnibus Objection, but it was unsuccessful. (Appx. 24, 26, B.D.I. 1939, 1944). Spyglass submitted a supplemental declaration of Irwin Reiter ("the Supplemental Reiter Declaration" and, together with the Initial Reiter Declaration, "the Reiter Declarations") in support of the Omnibus Objection.[6] The Supplemental Reiter Declaration attached documentation in support of the chain of title among the various special purpose vehicles and debtor and non-debtor entities to demonstrate TWC's ownership of the rights under the Cohen Agreement ("the Chain of Title Documents"). (*Id.* at Ex. 1-10).

On January 14, 2019, the Bankruptcy Court held a hearing in the Talent Party Litigation to consider the Summary Judgment Motion and related pleadings. (Appx. 28, B.D.I. 2005, 1/14/19 Hr'g. Tr.) At the hearing, Spyglass offered the Reiter Declarations into evidence and also offered the live testimony of Mr. Reiter in support of a finding that TWC owned the rights provided for

---

[6]     Appx. 25, B.D.I. 1940 (redacted); Appx. 27, B.D.I. 1945 (sealed).

under the Cohen Agreement and then sold the rights thereunder to Spyglass under section 363 of the Bankruptcy Code and in accordance with the APA.

At the close of the hearing, the Bankruptcy Court issued a bench ruling ("the Bench Ruling"), which granted Spyglass's Summary Judgment Motion, holding that the Cohen Agreement was not an executory contract as of the Petition Date. (*Id.* at 133:17-18). The Bankruptcy Court determined that although "ancillary performance is due on both sides," "the primary purpose of a work for hire contract in the industry is the completion of the project." (*Id.* at 134:14-23). The Bankruptcy Court further determined "the evidence presented and the application of New York law convinces [the court] that [Spyglass] has met its burden" of showing that TWC acquired the Cohen Agreement from SLP Films and was able to sell it to Spyglass. (*Id.* at 135:16-22). The Bankruptcy Court granted the Motion to Clarify only with respect to the fact that Spyglass purchased the rights under the Cohen Agreement pursuant to section 363 of the Bankruptcy Code under the Sale Order and thus Spyglass was bound by, and required to comply with, all post-closing obligations arising under the Cohen Agreement, including, but not limited to, contingent compensation obligations thereunder.[7] (*Id.* at 137:4-6). With respect to the Motion to Confirm, the Bankruptcy Court determined that, by the Final Contract List, Spyglass had conclusively designated the Appellants' agreements for assumption and assignment "to the extent that they are [determined to be] executory contract[s]" and otherwise "lost the right to call them an excluded asset." (B.D.I. 2005, 1/14/19 Hr'g Tr. at 40:21-23). The Bench Ruling was memorialized in the Order entered January 23, 2019.

---

[7]     Spyglass had already agreed to make post-closing contingent compensation payments, and this is not an issue on appeal. (*See* Appx. 8, B.D.I. 1187, at § 2(a)).

### C.     The Appeal

On February 25, 2019, the Talent Parties timely appealed the Order.   Also on February 25, 2019, the Talent Parties sought direct certification of the Appeal to the United States Court of Appeals for the Third Circuit.  (Appx. 31, B.D.I. 2125).  Spyglass took no position with respect to the request.  (Appx. 32, B.D.I. 2176).  On May 3, 2019, the Third Circuit issued an order denying the Talent Parties' motion for direct certification.  (Appx. 33, B.D.I. 2341).

The issues on appeal are (1) whether the Bankruptcy Court correctly concluded that the Cohen Agreement is not an executory contract subject to assumption and assignment, requiring cure of all existing defaults, (2) whether the Bankruptcy Court correctly found that Spyglass provided adequate evidence of chain of title to support the determination that TWC legally owned the rights appurtenant to the Cohen Agreement and could sell those rights to Spyglass through the Sale, and (3) whether the Bankruptcy Court correctly found that Spyglass had not conclusively designated the Talent Party Agreements for assumption and assignment through the Final Contract Notice.

## II.     <u>JURISDICTION AND STANDARDS OF REVIEW</u>

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1).

A grant of summary judgment is reviewed *de novo*, using the same standard applied by the bankruptcy court.  *See Robeson Indus. Corp. v. Hartford Accident & Indem. Co. (In re Robeson Indus. Corp.)*, 178 F.3d 160, 164 (3d Cir. 1999).  A motion for summary judgment will be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is

correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing the motion is entitled to all reasonable inferences from the evidence that could be drawn in its favor by the fact finder. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that all reasonable inferences must be drawn in favor of the non- moving party).

When reviewing the legal interpretation of a contract, a court will review the lower court's determinations *de novo*. *See Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1254 (3d Cir. 1993). This Court reviews the Bankruptcy Court's interpretation of the APA, the Cohen Agreement, and the Chain of Title Documents under a *de novo* standard and the Bankruptcy Court's determinations as to the qualifications of Mr. Reiter under an abuse of discretion standard. *See In re O'Brien Envt'l Energy, Inc.*, 188 F.3d at 122. The Bankruptcy Court's finding that judicial estoppel did not apply is reviewed under an abuse of discretion standard. *See McNemar v. Disney Store, Inc.*, 91 F.3d 610, 613 (3d Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## III.  ANALYSIS

### A.    The Cohen Agreement Is Not Executory

The Order turned on the Bankruptcy Court's determination that the Cohen Agreement – which Spyglass asserts is similar to the other Talent Party Agreements – was not executory as of the Petition Date, and thus Spyglass purchased its rights free and clear of any obligation to cure pre-closing contingent compensation pursuant to section 363 of the Bankruptcy Code.[8] Appellants argue that the Bankruptcy Court erred and should have found that the Cohen Agreement was

---

[8]     Spyglass had previously agreed that any sale would require it to make ongoing post-closing contingent compensation payments.

10

executory, such that any transfer to Spyglass would require its cure of defaults, including pre-closing contingent compensation owed, pursuant to section 365 of the Bankruptcy Code.

### 1. Relevant Terms

SLP Films, Inc. ("SLP Films"), a non-debtor special purpose entity, and the Cohen Parties entered into the Cohen Agreement as of September 21, 2011 for the purpose of engaging the services of Bruce Cohen to produce the Film. (Appx. 15, Adv. D.I. 8, Ex. A). The Cohen Agreement states that the "engagement and services hereunder in connection with the [Film] shall be deemed works-made-for-hire specially ordered or commissioned by [SLP Films, Inc.] in connection with a motion picture and/or audiovisual work." (*Id.* ¶ 9).

Paragraphs 2 and 3 of the Cohen Agreement provide for fixed compensation in the amount of $250,000, payable pursuant to the terms of a payout schedule, and contingent compensation based upon adjusted gross receipts, provided the Cohen Parties were not in "*breach or default*" of the agreement. (*Id.* ¶ 2 (emphasis added)).[9] There has been no allegation that the Cohen Parties did not receive compensation under paragraphs 2 or 3 for their work on the Film (other than the pre-closing contingent compensation).

Paragraph 4 of the Cohen Agreement provides for a producer credit in the Film for Cohen. Paragraphs 5, 6, and 7 of the Cohen Agreement address film production related obligations, such as reimbursement for travel and expenses, consultation rights, and an assistant for Cohen while the film was being produced.

---

[9]     Paragraph 3 of the Cohen Agreement states:

> Contingent Compensation: If the Picture is Produced with Artist and the producer thereof and Lender and Artist fully perform all required services and obligations hereunder and in relation to the Picture, and are otherwise *not in breach or default hereof*, Artist shall be entitled to receive the following "Contingent Compensation" . . . .

(Appx. 15, Adv. D.I. 8, Ex. A, ¶ 3 (emphasis added)).

Paragraph 9 of the Cohen Agreement provides that upon execution, Cohen and his loan-out company relinquished any and all rights to the film, including any ownership rights, exploitation rights, and intellectual property rights, including all rights to copyrights associated with the film.[10]

Paragraph 13 of the Cohen Agreement provided the right of first opportunity for Cohen should the Company create a sequel or prequel to the film for a period of seven years (until November of 2019).

Paragraph 17 of the Cohen Agreement imposed indemnification obligations and prohibited Cohen from assigning his rights or obligations to third parties.

Paragraph 20 of the Cohen Agreement provided a waiver of Cohen's right to seek injunctive relief relating to the ownership of the produced work:

---

[10]     Paragraph 9 of the Cohen Agreement states provides:

> Company [TWC] shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, and all elements therein for all now known or hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, video on demand, subscription video on demand, any computer-assisted media . . . character, prequel, sequel, remake, merchandising, soundtrack, novelization, Internet and any and all allied and ancillary rights therein, and the foregoing is inclusive of a full assignment to Company thereof.  If for any reason the results and proceeds of Artist's services hereunder are not deemed for a work-for-hire for Company, then Artist hereby assigns, grants and sets over unto Company all of Artist's rights of every kind and nature, including all rights of copyright, in and to the Picture and all of the results and proceeds of Artist's services hereunder . . . .  No breach of this Agreement by either party shall in any way affect Company's ownership of the Picture or all rights therein . . . .  Lender and Artist hereby grant to Company the right to issue and authorize publicity concerning Artist, and to use Artist's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture . . . .

(Appx. 15, Adv. D.I. 8, Ex. A, ¶ 9).

> No Injunctive/Equitable Relief: The rights and remedies of Lender and Artist in the event of any breach by Company of the provisions of this Agreement shall be limited to Lender's and/or Artist's right, if any, to recover damages in an action at law, and Lender and Artist *irrevocably waive* any right to seek and/or obtain equitable or injunctive relief . . . .

(*Id*. ¶ 20 (emphasis added)).

### 2. The Bankruptcy Court Applied the Proper Standards

Under well settled Third Circuit law, "[a]n executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Columbia Gas*, 50 F.3d 233, 239 (3d Cir. 1995) (quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)).[11] "Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365." *Exide*, 607 F.3d at 962. The Third Circuit advises that "[t]he time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." *Columbia Gas*, 50 F.3d at 240. To conduct this determination, we "consider contract principles under relevant nonbankruptcy law." *Id*. at 240 n.10; *General DataComm Industries, Inc. (In re General DataComm Industries, Inc. v. Arcara)*, 407 F.3d 616, 623 (3d Cir 2005). Here, New York provides the relevant nonbankruptcy law.[12] Thus, the issue before the Bankruptcy Court was whether, as of the Petition Date and under New York law, the Cohen Agreement contained obligations for the Debtors and Cohen to each perform such that, if

---

[11] Professor Vern Countryman, a leading bankruptcy scholar, created and advocated this definition in a law review article. *See Sharon Steel Corp*., 872 F.2d at 39 (citing Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439 (1973)). As Spyglass correctly notes, this standard, known as the Countryman test, resolved the initial ambiguity created by the legislative history. Congress described an "executory contract" as a contract "on which performance is due to some extent on both sides." H.R. Rep. No. 95-595, 347 (1977), 1978 U.S.C.C.A.N. 5787, 5963.

[12] The Cohen Agreement is governed by New York law. (Appx. 15, Adv. D.I. 8, Section 23).

left unperformed, the non-performance would constitute a material breach of the contract as a whole.

In making this determination, the Bankruptcy Court looked to the Third Circuit's decision in *In re Exide Technologies*, 607 F.3d 957 (3d Cir. 2010). (1/14/19 Hr'g Tr. at 133-34). In *Exide*, the Third Circuit examined the "substantial performance doctrine," as developed by the New York Supreme Court in *Hadden v. Consolidated Edison Co.*, 356 N.Y.S.2d 249, 312 N.E.2d 445, 449 (1974). The substantial performance doctrine is a reality-based approach to determining whether a contract is executory for purposes of section 365 of the Bankruptcy Code. Specifically:

> [U]nder New York law, only a breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission. The non-breaching party will be discharged from the further performance of its obligations under the contract *when the breach goes to the root of the contract*.

*Exide*, 607 F.3d at 963 (quoting *In re Lavinge*, 114 F.3d 379, 387 (2d Cir. 1997) (internal quotation marks omitted) (emphasis added)). Thus, when a party has substantially performed the main purpose of entering into the contract, the non-breaching party will not be excused from performance. As this determination necessarily involves a case-by-case analysis, the *Hadden* court examined the following factors: the "ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance." *Hadden*, 312 N.E.2d at 449.

The Third Circuit in *Exide* considered whether, under New York law, the nondebtor counterparty's ongoing, unperformed obligations under a trademark licensing agreement outweighed Exide's performance. The Third Circuit considered the ancillary remaining obligations under the agreement and determined that none went to the "'very root of the parties'

Agreement," and therefore could not outweigh Exide's substantial performance. *In re Exide Techs.*, 607 F.3d at 964.

Applying the substantial performance doctrine examined by the Third Circuit in *Exide*, the Bankruptcy Court determined that both the Cohen Parties and the Debtors substantially performed under the Cohen Agreement years before the Petition Date. "The primary purpose of a work for hire contract in the industry is the completion of the project . . . ." (1/14/19 Hr'g. Tr., at 134:19-20)). Regarding Cohen's obligations, the "transfer of the copyrights, the waiver of the right to enjoin, and the production of the film, all those have been performed by Mr. Cohen." (*Id.* at 134:9-13). "While ancillary performance is due on both sides, that does not mean that it is an executory contract" and "the payment obligation of the debtor to a non-debtor does not itself make it executory." (*Id.* at 134:14-17).

The Court finds no error in the Bankruptcy Court's application. First, the primary purpose, or "root" of the Cohen Agreement, which is self-described as a work-for-hire agreement, was the production of the film and the transfer of rights of authorship such that TWC could exploit such rights without concerns about claims from the Cohen Parties. The Cohen Agreement provides that the transfer of authorship rights occurred upon its execution. The material obligations under the Cohen Agreement were performed in 2011 and 2012 – in 2011, when the intellectual property and other rights to and under the film were transferred to the Debtors at the time the parties executed the Cohen Agreement, and in 2012 when the film was produced and released. The film was released on November 16, 2012, and there is no question that the Cohen Parties performed their production services for the film almost six years prior to the Petition Date. In exchange, the Cohen Parties received fixed compensation and contingent compensation. After the film was released, the only obligations remaining under the Cohen Agreement were ancillary and could not be material. The waivers referenced by Appellants are ancillary agreements necessary for the

transferee to enjoy such rights. In effect, these ancillary provisions were an agreement by Cohen not to take actions in the future which were inconsistent with the present rights transfer. That the ancillary obligations that remained under the Cohen Agreement as of the Petition Date were immaterial is evidenced by the terms of the Cohen Agreement itself: the Cohen Agreement provides that the Cohen Parties were only entitled to compensation (fixed and contingent) if the Cohen Parties rendered the production services *and* they were not in "not in breach or default" of the Cohen Agreement. Any breach of those ancillary terms would result in a monetary obligation. The Bankruptcy Court correctly determined that the Cohen Agreement was not executory under *Exide* or applicable state law at the time of the Debtors' bankruptcy filing.

### 3. Decisions Examining Similar Contracts Provide Clear Support for the Bankruptcy Court's Ruling

In reaching this conclusion, the Bankruptcy Court was guided by cases that considered whether similar work-for-hire agreements were executory, including the Ninth Circuit's decision in *Otto Preminger Films, Ltd v. Qintex Entertainment, Inc.* (*In re Qintex Entertainment, Inc.*), 950 F.2d 1492 (9th Cir. 1991), and *In re Stein & Day, Inc.*, 81 B.R. 263 (Bankr. S.D.N.Y. 1988).

In *Qintex*, the Ninth Circuit analyzed, among other things, whether four work-for-hire agreements, through which an actor, George C. Scott ("Scott") and his loanout company (together with Scott, "the Scott Parties") provided their services in connection with four made-for-television films ("the Scott Agreements") were executory. 950 F.2d at 1494. The Scott Parties were entitled under the Scott Agreements to receive a fixed fee and contingent compensation for providing Scott's acting services, and thereafter, the Scott Parties had some ancillary obligations under the agreement, including indemnification obligations. *Id.* at 1494, 1497. Under the Scott Agreements, the Scott Parties relinquished all "'all rights of any kind or nature, whether now or hereafter known, in and to and derived from the product . . . of Performer's services.'" *Id.* at 1494. At the time *Qintex* and its affiliated debtors filed for Chapter 11, Scott's acting services had been fully

performed. *Id.* As is the case here, the issue before the Ninth Circuit was whether the Scott Agreements were executory. *Id.* at 1493.

In affirming the lower court's finding that the Scott Agreements were not executory, the Ninth Circuit noted that, under the Scott Agreements, the Scott Parties had relinquished "'all rights of any kind or nature, whether now or hereafter known, in and to and derived from the product . . . of [Scott's] services hereunder and all material contained therein, in all media throughout the world . . . .'" *Id.* at 1497 (quoting the Scott Agreements). Accordingly, the Ninth Circuit agreed with the lower court that the Scott Parties lacked "any future rights to the fruits of Scott's acting services." *Id.* The Ninth Circuit also found that, as Scott had completed his acting services under the Scott Agreements, the Scott Parties had "substantially completed their duties under the contracts" and that "[t]he four television contracts contain no substantial unperformed duties owed by the Scott Parties to Qintex." *Id.* The Cohen Agreement is virtually identical in these respects.

Both the Bankruptcy Court here and the Ninth Circuit in *Qintex* found *Stein & Day,* to be helpful in their respective analyses.[13] In *Stein & Day*, the court considered whether a publishing contract was executory. *Id*. at 264. The debtor in that case was a publishing company, and the party claiming his contracts were executory was an author who wrote two books published by the debtor under two publishing contracts ("the Publishing Contracts"). *Id.* Under the Publishing Contracts, the author was entitled to fixed compensation, as well as contingent compensation in the form of royalties, which were calculated based on the number of books sold. *Id.* In addition, the author granted the debtor-publisher the exclusive rights to the copyrights and all renewals of same arising under the books, and "the exclusive right to print, publish, sell, and license others to do so in the United States and Canada and certain other territories." *Id.* This grant of exclusivity and relinquishment of rights to the debtor-publisher extended through the term of the Publishing

---

[13] *In re Qintex Entm't, Inc.*, 950 F.2d at 1497; 1/14/19 Hr'g. Tr., 134:18-19.

Contracts. *Id.* The author also gave the publisher all subsidiary rights related to the books (*e.g.*, the ability to reprint and syndicate the books). *Id.* In addition to these primary, material obligations under the Publishing Contracts, the contracts also contained some ancillary provisions, including representations and warranties, the grant of the right to the publisher to publish the author's next book, and an obligation by the author to produce a libel-proof manuscript. *Id.* at 264-65.

In ruling that the Publishing Contracts were not executory, the *Stein v. Day* court reasoned that the author had fully performed under the agreement, having already written both books and assigned all rights to the debtor-publisher during the contract terms; had such rights not been assigned, or had the author not completed the books, it would have constituted a material breach under the Publishing Agreements that would have excused the debtor-publisher's performance. *Id.* at 266. The court viewed the other, ancillary obligations as contingent and insufficient to render the Publishing Contracts executory under section 365 of the Bankruptcy Code. *Id.*

A comparison of the provisions of the Scott Agreement, as considered by the Ninth Circuit in *Qintex*, and the publishing contracts considered in *Stein & Day,* with those of the Cohen Agreement, provides clear support for the Bankruptcy Court's finding that the ancillary obligations that remained under the Cohen Agreement as of the Petition Date were immaterial. Indeed, the work-for-hire agreements at issue in this Appeal and in the *Qintex* and *Stein & Day* cases are substantially similar. In each agreement, the talent party (producer, actor, author) was required to perform services (producing, acting, writing) in exchange for fixed and contingent compensation – *i.e.*, obligations deemed "material" by the ruling courts such that the completion of those material obligations rendered the agreements substantially performed. In addition, each agreement contained ancillary provisions (rights of first refusal or opportunity, indemnification provisions, etc.), which the courts deemed insufficiently material to render the substantially performed agreements executory under section 365 of the Bankruptcy Code.

Appellants argue that the Bankruptcy Court's reliance on *Exide* and *Qintex* was misplaced because the substantial performance doctrine is inapplicable to an agreement like the Cohen Agreement which, "by its terms . . . requires full performance." Appellants cite Paragraph 3 of the Cohen Agreement, which provides: "If the Picture is produced with [Cohen] as the producer thereof and [Cohen] fully perform[s] all required services and obligations hereunder . . . and [is] not otherwise in breach or default hereof, [Cohen] shall be entitled to receive the following "Contingent Compensation . . ." (*Id*. at 22 (citing Appx. 15, Adv. D.I. 8, Ex. A, ¶ 3)). Appellants argue that because "[t]he Cohen Agreement explicitly states that a breach by Cohen of any of its terms would excuse the performance of SLP Films," "the Cohen Agreement is executory on its face." (*Id*. at 22 (citing ¶ 3)). In support, Appellants cite *Avant Guard Props., LLC v. New York City Indus. Dev. Agency*, 2015 N.Y. Misc. LEXIS 4028, at *15 (N.Y. Sup. Ct. Jan. 7, 2015). The agreement at issue in that case involved a sale-lease back transaction (not a work-for-hire agreement). *Id.* at *2-4. The debtor allegedly breached the agreement by impermissibly subleasing portions of the property without the consent required under the agreement and by failing to make certain payments due thereunder. *Id.* at *5-6. The *Avant Guard* court ruled that "[t]he substantial performance rule does not apply here, where the parties have made clear by the terms of the Lease that only complete performance will satisfy the agreement." *Id.* at *15. Appellants argue that the Bankruptcy Court erroneously dismissed the *Avant Guard* decision as unhelpful. As the Bankruptcy Court observed, however, the *Avant Guard* decision undertakes no analysis of whether or not the contract was executory. The Court finds no error in the Bankruptcy Court's reliance on substantial performance decisions.

#### 4. Appellants' Remaining Arguments Fail

Appellants argue that the continuing applicability of the Countryman definition is in question following the Supreme Court's decision in *Mission Products Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) because that decision did not mention Countryman or materiality in defining an executory contract. (*See* D.I. 18 at 17 n.4; *id.* at 20-22) The Court declines to find that *Tempnology* changed the axiomatic definition of an executory contract. The recent *Tempnology* decision concerns the effect of rejection of a trademark licensing agreement on the licensee. *Tempnology*, 139 S. Ct. at 1666. The Supreme Court reviewed the circuit split on this issue and held that the licensee is not estopped from operating under the license to its full term, despite the debtor's rejection. *Id.* at 1658. The Supreme Court reasoned that rejection is not rescission, and the debtor should not get more rights under the contract through rejection than it would have outside of the bankruptcy context. Moreover, the parties to the license *agreed and stipulated* that it was executory and, therefore, subject to assumption or rejection under section 365 of the Bankruptcy Code. *Id.* As such, the Supreme Court did not consider whether the license agreement was executory, much less change the commonly accepted legal standard for making such a determination. *Id.* The reference to its own precedent in setting the issue ("A contract is executory if 'performance remains due to some extent on both sides.'" *Id.* at 1658 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984)) is no indication that the well-established Countryman test has been rejected.

Appellants next argue that the Bankruptcy Court erred in concluding that the remaining obligations in the Cohen Agreement are not material "without any evidence on materiality of those obligations" remaining. (D.I. 18 at 15, 17-18). Appellants assert that, "because a materiality determination requires a fact-intensive analysis, it is not appropriate for summary disposition." (*Id.* at 18). Spyglass argues that "at no time did [Appellants] take the position" that the materiality

analysis required evidence, and the Court need not consider this issue on appeal. (D.I. 29 at 35). It appears, however, that this argument was raised by Appellants numerous times. In their filed oppositions to the June 8 Statement, Appellants argued that "[t]he Debtors have not submitted any evidence as to the materiality of the ongoing mutual obligations of the parties to the [] Contract" and that "[t]here has been no discovery, and hence no process by which an evidentiary record can be created." (D.I. 37 at 4-5 (citing A2614, A2641-41, A2707)). Appellants urged the Bankruptcy Court, at a minimum, to require "further briefing [which] should address the materiality of remaining obligations in the [] Contract" and also to "allow[] discovery." (*Id.*) Appellants raised this issue again in connection with the summary judgment, including in their opposition and at oral argument. (*Id.* at 5 (citing A5181; Appx.28, B.D.I. 2005, 1/14/19 Hr'g Tr. at 110:18-22)). The Court agrees that this argument was not waived. Although "the issue of whether a party has substantially performed is usually a question of fact," it may be decided as a matter of law "where inferences are certain." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). This is the case here. *See Exide*, 607 F.3d at 963 ("Our inspection of the record, however, reveals that the inferences are clear that EnerSys has substantially performed.") As discussed above, the inferences here are certain that the parties have substantially performed, and the Bankruptcy Court appropriately adjudicated the non-executory nature of the Cohen Agreement based upon the record.

Appellants further argue that, even if the Countryman test remains the appropriate test for determining whether or not a contract is executory, Cohen had unperformed obligations under the Cohen Agreement including "indemnification, refraining from seeking injunctive relief, compliance with procedures for exercising Cohen's right of first opportunity, and compliance with assignment restrictions and prohibitions." (D.I. 18 at 19). Appellants cite these "ongoing obligations – relating primarily to the exploitation and distribution of the film – that survive the

making of the [film], including warranty and indemnification obligations which are "perpetual" and thus "remained unperformed as of the Petition Date." (*Id.* at 21). The Court finds unavailing the contention that the Debtors' ownership of all rights under and to the film was somehow contingent upon future performance by Cohen – specifically, Cohen's obligation not to infringe upon the Debtors' rights to the Film – and that, as a result, material obligations remain under the Cohen Agreement. Appellants' position makes little sense in a work-for-hire case.

Appellants' argument is, in essence, that refraining from breaching a contract is somehow continued performance. Looking to the proper time period, the Petition Date, there is nothing that the Cohen Parties could have done that would have prevented TWC from continuing to exploit the film or that would have otherwise interfered with TWC's ownership rights to the film, which rights TWC received upon the Cohen Parties' entry into the work-for-hire agreement. (Appx. 15, Adv. D.I. 8, Ex. A, ¶ 20). The ancillary provisions cited by Appellants are designed to prevent the Cohen Parties from interfering with the ability to enjoy the transferred rights or to indemnify the transferee and do not rise to the level of materiality. They are in furtherance of the main purpose of the agreement, the production of a film and the transfer of any common law rights of authorship. If the Cohen Parties had breached one of the ancillary provisions of the Cohen Agreement, it would have had no impact on TWC's rights in the film on the Petition Date or the rights to the film that Spyglass purchased through the Sale. In fact, the Cohen Agreement provides that a breach by TWC of its obligations would not give rise to a right by the Cohen Parties to interfere with the use of the transferred work. Any breach of those ancillary terms would result in a monetary obligation, akin to the general unsecured claim that the Cohen Parties have the right to assert against the

estates with respect to contingent compensation that remained unpaid as of the Petition Date. The

cases that Appellants rely upon are inapposite and distinguishable from the issues on appeal here.[14]

### B. The Bankruptcy Court Was Not Required to Draw Improbable Inferences Where Evidence Supported Debtors' Chain of Title

Appellants argue that the Bankruptcy Court erred in determining that the Debtors acquired

the Cohen Agreement prior to the Petition Date such that they could sell it to Spyglass pursuant to

section 363 of the Bankruptcy Code. (D.I. 18 at 33). The Cohen Agreement was executed by

Cohen and SLP Films, which is not one of the Debtors. (*Id.* (citing A5103)). Appellants argue

that the evidence presented was inadequate to meet the burden of establishing that there was no

genuine issue of material fact as to whether the Debtors acquired the Cohen Agreement directly or

indirectly from SLP Films and could sell rights under it.

In support of the Summary Judgment Motion, Spyglass presented the Reiter Declarations.[15]

Together they contained a detailed explanation of the process by which the related Debtor and

non-Debtor entities operated in the context of the production of the film, and of the step by step

---

[14] The contracts at issue in *General DataComm Industries, Inc. (In re General DataComm Industries, Inc. v. Arcara)*, 407 F.3d 616 (3d Cir 2005) were unperformed employee benefit plans (not work-for-hire agreements), which the debtors were attempting to reject without adhering to the requirements of section 1114 of the Bankruptcy Court. *Id.* at 617-18. The contracts at issue in *In re Hawker Beechcraft, Inc.,* 486 B.R. 264 (Bankr. S.D.N.Y. 2013) were aircraft purchase agreements (not work-for-hire agreements), which contained material, continuing obligations by both parties (*e.g.*, the debtors had warranty obligations on the aircraft sold, they also were required to provide training for pilots and maintenance personnel, and the purchasers had an obligation to maintain the aircraft in a certain condition in order to take advantage of the warranty). *Id.* at 269-70. In addition, the debtors sought first day relief to continue providing these benefits to their customers under a customer programs motion. *Id.* at 272-73. The agreement at issue in *In re Worldcom, Inc.,* 343 B.R. 486 (Bankr. S.D.N.Y. 2006), was a settlement agreement (not a work-for-hire agreement) providing that the purchaser would not assert a claim against the property, would assist the debtor in maximizing any proceeds received as a result of governmental condemnation actions, and remit the debtor's share of the proceeds back to it. *Id.* at 488-89. The *Worldcom* court found that these provisions, which were the sum of the agreement, were material.

[15] Appx. 25, B.D.I. 1940 (redacted); Appx. 27, B.D.I. 1945 (sealed).

process by which TWC obtained ownership of the Cohen Agreement upon the dissolution of SLPTWC Films, LLC ("SLPTWC"). The Reiter Declarations were supported by extensive testimony by Mr. Reiter[16] at the hearing. (1/14/19 Hr'g. Tr. at 51-105). The record reflects that pursuant to the Cohen Agreement, SLP Films owned the rights pertaining to the film. (Appx. 15, Adv. D.I. 8, Ex. A, Section 9). Appellants do not dispute that the Production Services Agreement dated September 15, 2011[17] between SLPTWC and SLP Films effectuated the transfer of the Cohen Agreement from SLP Films to SLPTWC, nor that TWC was the sole member of SLPTWC. Applying New York law, the Bankruptcy Court determined that, upon the dissolution of SLPTWC, all of its owned assets and rights flowed up to the members. Because TWC was the only member of SLPTWC at the time of dissolution, the Bankruptcy Court concluded or inferred that the assets of SLPTWC (including any rights it had under the Cohen Agreement) automatically transferred to its sole member TWC upon its dissolution.

Appellants argue that the Bankruptcy Court was not presented with any evidence that, prior to its dissolution, SLPTWC effectuated an assignment or other transfer of the Cohen Agreement

---

[16] The Talent Parties argue that because Mr. Reiter is not the "custodian of records," he was unable to authenticate the Chain of Title Documents. Upon direct examination, Mr. Reiter explained that he is the executive vice president of accounting and financial recording at Spyglass, and prior to that, he worked for TWC in the same role. In this position, Mr. Reiter supervised the accounting group and the participations accounting group and negotiated distribution license agreements, and, in this capacity, was the signatory to a majority of the Chain of Title Documents. Mr. Reiter also stated that his experience in similar positions in the entertainment industry dates back several decades. The Talent Parties' "custodian of records argument" is a red herring. Aside from one question from Bradley Cooper's counsel on cross-examination, no party at the hearing raised the issue of whether Mr. Reiter was qualified to authenticate the Chain of Title Documents. Appellants do not dispute that Mr. Reiter was heavily involved throughout the film's production process and was in a position to explain how TWC followed the industry standard of utilizing special purpose vehicles in the production of the film. Despite raising the custodian issue on cross-examination, the Bankruptcy Court was apparently satisfied with Mr. Reiter's competency on the relevant issues, and the Court finds no abuse of discretion based on this record.

[17] Appx. 27, B.D.I. 1945 at Ex. 9 (sealed).

to TWC, and that its conclusion that rights under the Cohen Agreement automatically transferred upon SLPTWC's dissolution was improper. (D.I. 18 at 35). Appellants rely on the principle that courts must make all inferences in light of the nonmoving party on a motion for summary judgment. *See, e.g.*, *Anderson,* 477 U.S. at 255. As Spyglass correctly points out, however, this principle does not require the court to ignore the clear operation of the law. *See, e.g.*, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 60 n.10 (1995) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)) ("We need not credit purely conclusory allegations, indulge in speculation, or draw *improbable inferences*. Whether an inference is reasonable cannot be decided in a vacuum; it must be considered 'in light of the competing inferences' to the contrary.") (emphasis added). The colloquy between the Bankruptcy Court and counsel to the Appellants highlighted the Bankruptcy Court's position on this issue:

> THE COURT: At least under New York Law that would be supported. A dissolution of an LLC, the members get the assets.
>
> MR. GOTTFRIED: Well, but, Your Honor, first of all Mr. Reiter certainly is not a legal expert to come to that conclusion.
>
> THE COURT: No, but I am. I assume I can come to that conclusion.

(1/14/19 Hr'g. Tr. at 48:8-15). Appellants argue that the Bankruptcy Court's conclusion or inference on this point was erroneous because Delaware law applied to SLPTWC, not New York law, and under Delaware law, "the transfer of assets from an LLC to its members does not take place automatically upon a wind-up or dissolution." (*Id.*) Spyglass counters that Appellants' failure to argue this point below should preclude Appellants from raising it on appeal. *See Newark Morning Ledger Co. v. U.S.*, 539 F.2d 929, 932 (3d Cir. 1976) (citing *Sanchanko v. Gill*, 388 F.2d 859, 861 (3d Cir. 1968)) ("We generally refuse to consider issues that are raised for the first time on appeal."). This Court will not disturb the Bankruptcy Court's conclusion or inference that rights under the Cohen Agreement automatically transferred upon SLPTWC's dissolution to its sole

member because, even assuming that the Bankruptcy Court should have applied Delaware law instead of New York law, the result would be the same. Both section 18-804 of title 6 of the Delaware Code and section 704 of chapter 34 of the New York Limited Liability Company Law provide for a nearly identical dissolution scheme. Under both statutes, upon dissolution, the assets of the limited liability company flow first to creditors, including members who are creditors, and then to the members of the limited liability company. *See* 6 Del. Code § 18-804; 34 N.Y. LLC L. § 704. When TWC acquired the film and all rights thereto, it satisfied all financial obligations to SLPTWC's creditors. (1/14/19 Hr'g. Tr. at 66:1-25; 67:1-11; Appx. 5331; Appx. 5432-5435).

The Court finds that the evidence supported by the Reiter Declarations and Mr. Reiter's testimony were sufficient to demonstrate the absence of a genuine issue of disputed material fact that, upon dissolution, TWC obtained the assets of SLPTWC, including rights under the Cohen Agreement, and that TWC was able to sell these rights to Spyglass pursuant to the Sale.

### C. Spyglass Appropriately Reserved its Rights to Designate the Talent Party Agreements Upon the Disposition of the Talent Party Litigation

The Talent Parties contend that the Bankruptcy Court ignored the plain language of the APA by allowing Spyglass to reserve its rights to condition assumption and assignment of the Talent Party Agreements upon the outcome of the Talent Party Litigation and the Cohen Adversary Proceeding. The Talent Parties rely on Section 2.8(i) of the APA, which created the Assumption Outside Date of November 8, 2018, and argue that it offered Spyglass no flexibility with respect to the designation of executory contracts for assumption and assignment. In other words, the Talent Parties contend that, upon the Assumption Outside Date, Spyglass had two options: it could designate the Talent Party Agreements as "Excluded Assets" or it could take assignment of the Talent Party Agreements as executory contracts. (D.I. 18 at 38-39). The Talent Parties contend that, despite the fact that litigation was pending on the nature of these contracts at the same time,

Spyglass had to take a position on the issue and that this designation changed the very nature of the agreements in question.

A party cannot change the legal characteristics of a contract by placing into one category or another. *See, e.g.*, *In re Exide Technologies*, 378 B.R. 762, 766-67 (Bankr. D. Del. 2007) ("[T]he [contract] language cannot 'deem' a non-executory contract to be an executory contract so that the Debtor can assume it") (citing *In re Fitch*, 174 B.R. 96, 101 (Bankr. S.D. Ill. 1994)) ("A debtor cannot change the nature of a contract merely by electing to assume it under § 365"). Litigation regarding the alleged executory nature of the Cohen Agreement remained pending as the Assumption Outside Date approached. Thus, Spyglass included in the Final Contract Notice the reservation of rights. (Appx. 19, B.D.I. 1695, at 2 n.3). Judge Walrath acknowledged this process during the Hearing:

> Lantern did all that it possibly could to get me to decide that issue before November 8th. And I think because of the court's own calendar, it was not possible to do that. I think that they did preserve that issue as to whether or not they're executory or non-executory for the court's decision at my proper scheduling.

(1/14/19 Hr'g. Tr. at 40:14-20). Contrary to the Talent Parties' arguments, the Bankruptcy Court did not expand the plain meaning of the APA or the Assumption Outside Date by allowing this process. The Bankruptcy Court ruled that, if the Talent Party Agreements were found to be executory, Spyglass could not then designate the Talent Party Agreements as "Excluded Assets" under the APA; Spyglass would be required to take assignment of them and comply with cure obligations. The converse would apply as well; if the Talent Party Agreements were found to be non-executory, Spyglass would be required to comply with all post-closing obligations under the Talent Party Agreements as part of the purchase under section 363 of the Bankruptcy Code.

The Talent Parties argue that the Bankruptcy Court erred by failing to apply the doctrine of judicial estoppel to preclude Spyglass "from reversing its position and claiming that the

November 8 deadline was a 'soft' deadline that did not require Spyglass to definitively and unequivocally designate contracts for assumption and assignment." (D.I. 18 at 42). This contention is disconnected from the record in these Chapter 11 cases.

"Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment . . . . A litigant is required to be consistent in his conduct. He may not maintain a position regarding a transaction wholly inconsistent with his previous acts in connection with that same transaction." *Vision Metals, Inc. v. SMS DEMAG, Inc. (In re Vision Metals, Inc.)*, 325 B.R. 138 (Bankr. D. Del. 2005) (citations and quotations omitted).

The record reflects that Spyglass did not "abus[e] the judicial process through cynical gamesmanship." As the Bankruptcy Court noted, Spyglass did everything in its power to get the Bankruptcy Court to get all issues surrounding the executory nature of the Debtors' contracts in advance of the November 8 deadline. (*Id.* at 40:14-20). Notwithstanding, Appellants argue that Spyglass received an enormous benefit (*i.e.*, a $21 million price reduction) in exchange for agreeing to a hard deadline, then changed its position by "conditionally" designating contracts for assumption and assignment. (D.I. 37 at 19). According to Appellants, "Spyglass's use of a 'conditional designation' of contracts in the Final Contract List was inconsistent with the hard deadline." (*Id.*). The Court agrees with the Bankruptcy Court's determination that Spyglass **had** conclusively designated the Appellants' agreements for assumption and assignment "to the extent that they are [determined to be] executory contract[s]." (1/14/19 Hr'g Tr. at 40:12-25). The Bankruptcy Court agreed with the Committee that Spyglass had otherwise "lost the right to call them an excluded asset," stating "I don't think the November 8 notice preserved that which was the bargain for hard deadline." (*Id.* at 40:21-25). A review of the colloquy and ruling reflect that

the Bankruptcy Court considered Appellants' argument and determined that there was no change in position or detriment here, and the Court agrees. (*Id*. at 36:14-40:25). Spyglass did not take a position contrary to what was negotiated between Spyglass, the Debtors, and the Committee through the Second Amendment. The fact that certain disputes, including the one on Appeal, were not fully adjudicated prior to the November 8 deadline made Spyglass's reservation of rights appropriate. By designating the Talent Party Agreements as "Disputed Contracts," Spyglass did not its change position, it reserved its rights until the Bankruptcy Court could fully adjudicate at least the issues surrounding the Cohen Agreement. Under the facts and circumstances of this case, the Bankruptcy Court's decision not to apply judicial estoppel was not an abuse of discretion. *McNemar,* 91 F.3d at 613.

## IV.    CONCLUSION

The Bankruptcy Court correctly held that (i) the Cohen Agreement was not executory as of the Petition Date, and therefore, that Spyglass purchased the Debtors' rights under the Cohen Agreement through the Sale; (ii) TWC owned the rights under the Cohen Agreement and thus, could sell such rights to Spyglass through the Sale, free and clear of all claims; and (iii) Spyglass appropriately reserved its rights to designate the Talent Party Agreements upon the disposition of the Talent Party Litigation. For the reasons set forth herein, the Order is affirmed. A separate Order shall be entered.